*Jason Ronald Brvenik v. Brooke Ann Kavanagh*, Nos. 1187 & 2058, Sept. Term, 2024. Opinion by Tang, J.

**REFORMATION OF INSTRUMENTS – RIGHT OF ACTIONS AND DEFENSES – GROUNDS FOR REFORMATION – MISTAKE AND FRAUD**

One of two circumstances must exist before a court of equity will reform a written contract: either mutual mistake; or fraud, duress, or inequitable conduct.

Mutual mistake exists where there has been a meeting of the minds—and an agreement actually entered into, but the instrument, in its written form, does not express what was intended by the parties thereto.

A written instrument can also be reformed when a mistake is made by one of the parties accompanied by fraud, duress, or other inequitable conduct practiced on the person making the mistake by another party. In the case of fraud or inequitable conduct, if one party at the time of the execution of a written agreement knows that it does not accurately express the intention of the other party, and also knows what that intention is, the latter can have the agreement reformed so that it will express that intention.

The equitable remedy of reformation was available to the ex-wife, who sought to revise a provision in the marital settlement agreement regarding the calculation of her equity in the parties' lake house. The ex-wife's attorney inadvertently deleted a material phrase during the final exchange of redlines. The ex-husband was aware of this deletion but did not disclose the clerical error before signing. The court reformed the provision to reflect the ex-wife's intent by including the deleted phrase.

**EVIDENCE – ADMISSIONS – ACTS OR CONDUCT – COMPROMISE OR SETTLEMENT**

Evidence regarding the deletion of a material phrase in the marital settlement agreement before execution was not barred by Maryland Rule 5-408, which governs compromise and offers to compromise. The ex-wife did not seek to admit the evidence to prove the validity or invalidity of a claim but offered it for another purpose—specifically, to show that the deletion was a mistake.

Circuit Court for Howard County
Case No. C-13-FM-22-001601

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

Nos. 1187 & 2058

September Term, 2024

_____

JASON RONALD BRVENIK

v.

BROOKE ANN KAVANAGH

_____

Zic,
Tang,
Kenney, James A., III
    (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Tang, J.

_____

Filed: July 1, 2026

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

Jason Brvenik, the appellant, noted two appeals from two separate orders entered by the Circuit Court for Howard County concerning a section of the marital settlement agreement ("MSA") between him and his former wife, Brooke Kavanagh, the appellee, regarding the disposition of their lake house. The issues raised in the second appeal depend on the resolution of the primary issue in this first appeal, which we rephrase as follows:

Did the circuit court err in reforming the MSA?

For the reasons set forth below, we affirm the judgment.[1]

---

[1] This Court consolidated the two appeals. In the first appeal (ACM-REG-1187-2024), Mr. Brvenik primarily challenges the circuit court's reformation of the MSA and the award of attorney's fees under the MSA's prevailing party provision. In his brief, he raises the following issues:

I.   Did the Circuit Court for Howard County err in admitting as parol evidence offers of compromise and settlement?

II.  Did the Circuit Court for Howard County err in making an erroneous finding of fact that [Mr. Brvenik's] attorney's research into Mutual Mistake post-execution of the [MSA] was evidence that [Mr. Brvenik] knew that the accepted agreement contained a scrivener's error?

III. Did the Circuit Court for Howard County err in determining that there was a mutual mistake in the drafting of the parties['] [MSA]?

IV.  Did the Circuit Court for Howard County err in awarding attorney's fees?

After reforming the MSA, the circuit court granted Ms. Kavanagh's motion to enforce it, finding that Mr. Brvenik breached the MSA regarding the disposition of the lake house. The court awarded Ms. Kavanagh additional attorney's fees and ordered the appointment of a trustee to sell the lake house. Mr. Brvenik noted a second appeal (ACM-REG-2058-2024), raising two issues, which we have renumbered sequentially to follow those in the first appeal:

V.   Did the Circuit Court err in enforcing the reformed agreement?

VI.  Did the Circuit Court err in awarding attorney's fees to [Ms. Kavanagh] for seeking to enforce the reformed agreement?

# I.

## BACKGROUND

Mr. Brvenik and Ms. Kavanagh were divorced pursuant to an order of judgment of absolute divorce entered on July 20, 2023. The judgment incorporated, but did not merge, the parties' MSA, executed on July 12, 2023. Each side was represented by counsel who negotiated the terms of the MSA.

On December 29, 2023, Ms. Kavanagh filed a Motion to Reopen Case and for Other Relief. She requested that the court reopen the case and reform the MSA due to a clerical error in the language affecting the calculation of her equity in the lake house. Mr. Brvenik opposed the motion.[2] The court held a hearing on May 28, 2024, during which the parties

---

Regarding issue V, Mr. Brvenik states that the appeal is to "preserve" his rights under the MSA if the judgment of reformation is reversed. Similarly, for issues IV and VI, he states that if the court's decisions to reform the MSA and grant the motion to enforce are reversed, the fee awards would be "inappropriate" and should be reconsidered by the circuit court.

For the reasons stated in this opinion, we affirm the court's judgment of reformation. Mr. Brvenik offers no argument supporting issues IV through VI if the judgment of reformation is affirmed. *See* Md. Rule 8-504(a)(6) (requiring that briefs contain "[a]rgument in support of the party's position on each issue"); *Klauenberg v. State*, 355 Md. 528, 552 (1999) (concluding that question of whether the trial court erred in denying a motion for mistrial was waived on appeal where "[a]ppellant proffer[ed] no argument as to why the trial court abused its discretion in denying the motion for mistrial"). Accordingly, we decline to address these issues and need not summarize the related facts or procedural history.

[2] Prior to the hearing, Mr. Brvenik filed a motion to dismiss Ms. Kavanagh's motion, arguing that she was effectively seeking to revise the judgment of absolute divorce, which he asserted was untimely and improper under Maryland Rules 2-534 and 2-535. The court denied Mr. Brvenik's motion to dismiss. On appeal, Mr. Brvenik neither raises this issue in his statement of the questions presented nor articulates any argument in his briefs that the court erred in denying his motion to dismiss Ms. Kavanagh's motion. Accordingly, we do not address this issue.

and their respective counsel testified. We summarize the relevant evidence in the light most favorable to Ms. Kavanagh as the prevailing party. *See Dynacorp Ltd. v. Aramtel Ltd.*, 208 Md. App. 403, 451 (2012).

## A.

## Lake House

The provision at issue relates to the disposition of the parties' lake house, which is owned as tenants by the entireties and subject to a lien of mortgage in Mr. Brvenik's name. Paragraph 3.b.i of the MSA provides that the parties agree to sign a listing agreement for the sale of the lake house no later than September 24, 2023, and that the net proceeds from the sale would be divided equally between the parties. Subsection 3.b.ii sets forth the procedure for establishing the listing price.

Subsection 3.b.iii grants Mr. Brvenik the option to purchase Ms. Kavanagh's equity in the lake house and outlines how her equity is to be calculated. The subsection at issue in this appeal is 3.b.iii.B, reproduced and highlighted below, from the executed version of the MSA that was incorporated but not merged into the order for judgment of absolute divorce:

> iii. Notwithstanding the foregoing, Husband shall have the option to purchase Wife's Equity in the Lake House until the later of such time as the parties' [sic] accept a bona fide, third party offer or December 31, 2023. Wife's Equity shall be determined as set forth below.
>
>> A. Husband shall obtain a certified appraisal for fair market value of the Lake House and present the same to Wife. If Wife does not agree with Husband's certified appraisal, Wife shall notify Husband of her objection and obtain her own certified appraisal for fair market value of the Lake House and present the same to Husband. If Husband does not agree with Wife's certified appraisal, or the parties are unable to otherwise agree upon a fair market value of the Lake House, then the average of the

3

parties' two (2) appraisals shall be used to determine the fair market value of the Lake House.

B. **The fair market value of the Lake House shall be the existing mortgage balance at the time of the buy-out, and then multiplied by 50%. The remaining sum shall be Wife's Equity.**

C. Upon receipt of payment in an amount equal to Wife's Equity, Wife agrees to convey to Husband all of her right, title and interest in and to the Lake House . . . . All costs associated with the conveyance of the Lake House to Husband shall be the sole responsibility of Husband . . . .

In early October 2023, Mr. Brvenik obtained an appraisal of the lake house pursuant to subsection iii.A, with both parties agreeing on the appraised value of $823,000. They scheduled to meet on November 7, during which Mr. Brvenik was to pay Ms. Kavanagh her share of the equity in exchange for her signing the deed over to him. Prior to the meeting, she texted him requesting a copy of the mortgage payoff balance and the cashier's check for her equity, which she expected to exceed $291,000.

Unbeknownst to her, Mr. Brvenik significantly reduced the mortgage balance by approximately $240,000 between the judgment of divorce and November 7, leaving a balance of $5,092.75. When they met on November 7, Mr. Brvenik attempted to pay Ms. Kavanagh $2,552.63, representing her equity—half of the existing mortgage balance pursuant to subsection iii.B as written, *supra*. However, Ms. Kavanagh refused to sign the deed conveying her interest in the lake house to him.

## B.

### Deletion of "Reduced By"

As stated, Ms. Kavanagh moved to reopen the case, seeking reformation of subsection iii.B of the MSA. She asserted that subsection iii.B should be reformed because

4

her attorney inadvertently deleted a material phrase during the final revisions and that she intended to state that her equity in the lake house is calculated by taking the appraised, fair market value ($823,000), reducing it by the existing mortgage balance, and then multiplying the result by 50%. In other words, she contended that subsection iii.B should have read:

> B. The fair market value of the Lake House shall be **reduced by** the existing mortgage balance at the time of the buy-out, and then multiplied by 50%. The remaining sum shall be Wife's Equity.

(emphasis added).

At the evidentiary hearing, Ms. Kavanagh's attorney explained how the mistake occurred. She testified that "[o]nce the parties had reached an agreement on terms," Mr. Brvenik's attorney drafted the MSA and that draft "went back and forth several times" between the two of them. She made the "last revision[s]," which she emailed to Mr. Brvenik's attorney on July 11, 2023. Her redlines to subsection iii.B were as follows:

> B. The fair market value of the Lake House shall ~~then~~ be ~~reduced by a) five percent (5%) of the fair market value of the Lake House, and b)~~ the existing mortgage balance at the time of the buy-out, and then multiplied by 50%. The remaining sum shall be Wife's Equity.

Ms. Kavanagh's attorney testified that she inadvertently deleted "reduced by" in the process of deleting the clause, "a) five percent (5%) of the fair market value of the Lake House, and b)." Ms. Kavanagh's attorney confirmed that the method for calculating the fair market value of the lake house was never a point of contention between the parties. She explained that the phrase "reduced by" "should have remained," and that the actual "negotiating points" related to provisions under "little a and little b."

5

Ms. Kavanagh's attorney further confirmed that she and Mr. Brvenik's attorney never discussed the fair market value of the lake house being equal to the mortgage balance, nor had she been involved in any other cases where the fair market value of real property was determined as the mortgage balance. She also testified that she never had conversations with opposing counsel about altering the fifty-fifty division of marital property to allow Mr. Brvenik to retain the "lion['s] share" of the lake house.

Mr. Brvenik's attorney testified that he did not recall any discussions with Ms. Kavanagh's attorney about changing the language in subsection iii.B to equate the fair market value of the lake house with the mortgage balance. When asked why an appraisal under subsection iii.A was necessary if the fair market value was simply equal to the existing mortgage balance, counsel stated that he did not know.

Mr. Brvenik testified. He indicated that he actively participated in negotiating the MSA through his attorney. He acknowledged that he first became aware that subsection iii.B read that the fair market value of the lake house would have equaled the mortgage balance when the redlines were presented to him on July 11, 2023. He stated that he was not surprised by that redline, as it seemed to him that Ms. Kavanagh was making a concession in exchange for the numerous benefits she was receiving under the MSA.

After the parties signed the MSA and it was incorporated into the order for judgment of absolute divorce on July 12, Mr. Brvenik retained new counsel on July 21 to address a "potential post-judgment matter." His fee invoices, some with unredacted entries, were admitted without objection. The unredacted portions revealed that on August 1 and 2, Mr. Brvenik's new counsel researched the "standard for mistake in an agreement and court's

authority to amend signed MSA" and drafted a memo. On August 3, counsel amended the memo to "include additional research on the courts' definition of mutual mistake." When questioned about these entries, Mr. Brvenik claimed that he had engaged new counsel to review the MSA due to a potential dispute over a wedding ring.

Ms. Kavanagh also testified. She stated that she was unaware of her attorney's mistake in redlining and only learned of the error on November 7, 2023, when Mr. Brvenik pointed out the language in the executed version of the MSA. She further testified that she would not have signed the MSA if she knew about the mistake.

During closing arguments, Ms. Kavanagh argued through counsel that Mr. Brvenik was aware of the redlining mistake before signing the MSA and exploited it. Therefore, she requested that subsection iii.B should be reformed to reflect her intended inclusion of "reduced by."

## C.

### Court's Ruling

At the end of the hearing, the court gave its oral ruling and decided to reform the language of subsection iii.B of the MSA. The court found that Ms. Kavanagh's attorney made a clerical error by deleting the phrase "reduced by" from the subsection. It explained that the error was obvious because, without the phrase, the subsection—when read alongside related subsections—became nonsensical. Specifically, it observed that subsection iii provided for determining Ms. Kavanagh's equity based in part on the fair market value of the lake house, which was to be established by first obtaining an appraisal under subsection iii.A. The court noted that an appraisal would be unnecessary if

subsection iii.B stood as redlined, as there would be no reason to obtain an appraisal when the fair market value would simply equal the mortgage balance. The court further explained that consistent with "principles of marital property," property valuation is based on "net equity" rather than equating value with the amount of debt on the property.

The court further found the mistake to be mutual, concluding that Mr. Brvenik knew the deletion of "reduced by" was a mistake. It did not find credible Mr. Brvenik's testimony that he believed Ms. Kavanagh intended to delete the phrase. It found that Mr. Brvenik was an active participant in the negotiations, that the deletion of the phrase "was not what was negotiated [and] discussed," and that both attorneys confirmed it was never discussed in that manner.

Moreover, the court explained that the entries in Mr. Brvenik's post-divorce fee invoice showing that his new counsel researched the issue of mutual mistake corroborated Mr. Brvenik's knowledge that the deletion of the phrase was a mistake. The court did not find it credible that he had engaged another law firm immediately following the divorce because he wanted advice about his potential liability regarding the wedding ring.

The court reformed subsection iii.B to "put the parties back in the position that they would have been in." Accordingly, the court entered judgment on the docket on June 14, 2024, reforming subsection iii.B to read as follows:

> B. The fair market value of the Lake House shall be **reduced by** the existing mortgage balance at the time of the buy-out, and then multiplied by 50%. The remaining sum shall be Wife's Equity.

(emphasis added). Husband timely noted this appeal.

## II.

### OVERVIEW OF RELEVANT LAW

"[O]ne of two circumstances must exist before a court of equity will reform a written contract: either there must be mutual mistake, or there must be fraud, duress, or inequitable conduct." *Md. Port Admin. v. John W. Brawner Contracting Co., Inc.*, 303 Md. 44, 59 (1985); *Hous. Equity Corp. v. Joyce*, 265 Md. 570, 580 (1972) ("Equity will reform a written document when and only when there is a mutual mistake of fact or a mistake is made by one of the parties accompanied by fraud, duress or other inequitable conduct practiced on the person making the mistake by another party . . . .").

### A.

### Reformation Based on Mutual Mistake

Mutual mistake exists "where there has been a meeting of the minds—and an agreement actually entered into, but the instrument, in its written form, does not express what was intended by the parties thereto." *Moyer v. Title Guarantee Co.*, 227 Md. 499, 505 (1962). If mutual mistake is proven, then Maryland courts "will reform a written instrument to make it conform to the real intention of the parties." *Hoffman v. Chapman*, 182 Md. 208, 210 (1943); *Vincent v. Palmer*, 179 Md. 365, 375–76 (1941) ("If both parties have an identical intention as to the terms to be embodied in a release, and the writing executed by them is materially at variance with that intention, either party can have the writing reformed so that it will express the intention of the parties."). For example, a scrivener's error or oversight by the neutral drafter of a written instrument is considered the "mistake of all parties" and, accordingly, can be the basis to reform an instrument based upon mutual

9

mistake. *See Kishter v. Seven Cts. Cmty. Ass'n, Inc.*, 96 Md. App. 636, 643 (1993) ("*If [the trial court] finds that the draftsman was the agent for all parties*, then the *Hoffman* holding makes it clear that the draftsman's mistake was the 'mistake of all parties,' *i.e.,* the mistake was mutual." (emphasis added)); *Hoffman*, 182 Md. at 214 ("Where a deed . . . fails to express the manifest intention of the parties *on account of a mistake of the draftsman*, whether from carelessness, forgetfulness or lack of skill, equity will rectify the mistake to make the deed express the real intention of the parties." (emphasis added)).

**B.**

**Reformation Based on Mistake Accompanied by Fraud, Duress, or Other Inequitable Conduct**

A written instrument can also be reformed when "a mistake is made by one of the parties accompanied by fraud, duress or other inequitable conduct practiced on the person making the mistake by another party." *Hous. Equity Corp.*, 265 Md. at 580; *see* 27 Williston on Contracts § 70:104, Westlaw (4th ed., May 2026 update) ("Williston") ("The law permits reformation of instruments to reflect the true intention of the parties when the error has arisen by the *unilateral mistake* of one party and that mistake is *accompanied by* clear and convincing evidence of some sort of *fraud, deception, or other bad faith activity* by the other party that prevented or hindered the mistaken party in the timely discovery of the mistake." (emphases added)). "In effect, the party with knowledge of the mistake is estopped from relying on the mistake." Williston § 70:112; *accord Gross v. Stone*, 173 Md. 653, 666 (1938) ("A court of equity will not permit one party to take advantage of and

10

enjoy the benefit of an ignorance or mistake of law by the other, which he knew of and did not correct." (citation omitted)).

Fraud or other inequitable conduct necessary to justify reformation of a contract need not involve actual intentional deceit. *Hennig v. Ahearn*, 601 N.W.2d 14, 26 (Wis. Ct. App. 1999). Moreover, it is not necessary for inequitable conduct to be "intentionally misleading, much less that it should be actual fraud." *Gross*, 173 Md. at 666 (citation omitted). It is enough that the "misconception . . . was the result of, or even aided or accompanied by, incorrect or misleading statements, or acts of the other party." *Id.* (citation omitted); *see, e.g.*, *Elling v. Travers*, 162 Md. 597, 607 (1932) ("[I]f the appellants executed the agreement in the mistaken, but honest, belief that its execution did not affect their remedy against the cab company, and but for such belief they would not have executed it, and the insurance company knew that to be so, and with that knowledge induced the execution of the agreement and, against the appellants' protest, retained its benefits, the acts of the insurance company might well constitute such inequitable conduct as added to the mistake of law would justify a court of equity in setting it aside.").

The Supreme Court of Maryland, citing the Restatement (First) of Contracts, § 505 (1932), explained:

> [I]f one party at the time of the execution of a [written agreement] knows that it does not accurately express the intention of the other party, and also knows what that intention is, *the latter can have the [agreement] reformed so that it will express that intention*.

*Vincent*, 179 Md. at 376 (emphasis added); *accord England v. Universal Fin. Co.*, 186 Md. 432, 438–39 (1946).

11

The rule in § 505 of the Restatement (First) of Contracts has been incorporated into § 166 of the Restatement (Second) of Contracts (1981),[3] which provides, in relevant part:

> If a party's manifestation of assent is induced by the other party's fraudulent misrepresentation as to the contents or effect of a writing evidencing or embodying in whole or in part an agreement, the court at the request of the recipient may reform the writing to express the terms of the agreement as asserted,
>
> (a) if the recipient was justified in relying on the misrepresentation . . . .[4]

The Section's Comment a explains that this rule applies "to the case where only one party is mistaken and the other, although aware of the mistake, says nothing to correct it. *In that case his non-disclosure is equivalent to an assertion that the writing is as the other understands it to be*." *Id.* § 166, cmt. a (emphasis added). Section 166 provides an illustration based on that in former § 505. *See id.* § 166, Reporter's Note. This illustration is analogous to the circumstances of the instant case:

---

[3] *See* Restatement (Second) of Contracts § 166, Reporter's Note (explaining that § 166 replaces §§ 491 and 505 of the Restatement (First) of Contracts).

[4] "Reformation is not precluded by the mere fact that the party who seeks it failed to exercise reasonable care in reading the writing, but his reliance on the misrepresentation must be justified and the right to reformation is therefore subject to the rule on fault stated in § 172." Restatement (Second) of Contracts § 166, cmt a. Comment a to § 172 explains, "The recipient's fault makes [her] reliance unjustified *only in extreme cases where [she] has failed to act in good faith and in accordance with reasonable standards of fair dealing*." *Id.* § 172, cmt. a (emphasis added); *see, e.g., id.* illus. 1 ("A and B reach an understanding that they will execute a written contract containing terms on which they have agreed. A prepares a writing containing essential terms different from those agreed upon and induces B to sign it by telling him that it contains the agreed terms and that it is not necessary for him to read it. Although B's apparent manifestation of assent is effective if he had a reasonable opportunity to read the writing, *his reliance is justified since his fault does not amount to a failure to act in good faith and in accordance with reasonable standards of fair dealing*. The contract is voidable by B. In the alternative he may have the writing reformed." (emphasis added and citation omitted)). Mr. Brvenik has not asserted any such unjustifiable reliance on the part of Ms. Kavanagh.

12

4. A, seeking to induce B to make a contract to sell a tract of land to A for $100,000, makes a written offer to B. A knows that B mistakenly thinks that the offer contains a provision under which A assumes an existing mortgage and that it does not contain such a provision, but does not disclose this to B for fear that B will not accept. B is induced by A's non-disclosure to sign the writing, which is an integrated agreement. *A's non-disclosure is equivalent to an assertion that the writing contains such a provision* and amounts to a fraudulent misrepresentation. *At the request of B, the court will reform the writing to add the provision for assumption.*

*Id.* cmt. a, illus. 4 (citations omitted) (emphases added); *accord id.* § 161 ("A person's non-disclosure of a fact known to him is equivalent to an assertion that the fact does not exist . . . where he knows that disclosure of the fact would correct *a mistake of the other party as to the contents or effect of a writing*, evidencing or embodying an agreement in whole or in part." (emphasis added)); *id.* § 161, cmt. e ("One party cannot hold the other to a writing if he knew that the other was mistaken as to its contents or as to its legal effect. He is expected to correct such mistakes of the other party and his failure to do so is equivalent to a misrepresentation, which may be grounds either for avoidance under § 164 or for reformation under § 166."); *see also id.* § 161, cmt. e, illus. 12.

Corbin on Contracts provides a similar articulation of these principles:

[O]ne who knows of another's mistake and says nothing *will find himself bound by a contract that he did not intend to make.* Suppose one party assents to a writing, being mistaken as to the terms that it contains or as to the ordinary meaning of the terms, and the other, with knowledge of this mistake, likewise assents. *The language of an agreement will be interpreted according to the meaning given to it by one party if the other had actual knowledge that such was the meaning so given.* It is certain that such a bad actor will not be permitted to enforce the agreement according to its words in their usual meaning. The mistaken party is certainly entitled to avoid the contract but may, instead, get reformation and enforcement as reformed.

7 Corbin on Contracts § 28.41, LexisNexis (2025) ("Corbin") (emphases added).

13

Although the mistake under such circumstances may be a unilateral one, "[a] mistake by one party with knowledge of that mistake by the other is equivalent to a mutual mistake." Williston § 70:112. "[A] mistake by one party, and knowledge of the mistake by the other, justifies relief as fully as a mutual mistake." *Id.*

## C.

## Standard of Proof

Evidence of mistake must be clear and convincing. *Lazenby v. F.P. Asher, Jr. & Sons, Inc.*, 266 Md. 679, 683 (1972) ("The authorities all require that the parol evidence of the mistake and of the alleged modification must be most clear and convincing . . . ." (citation omitted)). "To be clear and convincing, evidence should be 'clear' in the sense that it is certain, plain to the understanding, and unambiguous and 'convincing' in the sense that it is so reasonable and persuasive as to cause [the factfinder] to believe it." Maryland Pattern Jury Instructions-Civil 1:17 (5th ed. 2018).

## III.

## DISCUSSION

This case implicates a mistake by one of the parties accompanied by fraud or other inequitable conduct. Mr. Brvenik argues that the circuit court erred in reforming the MSA on three grounds. First, he contends the court improperly admitted settlement discussions in violation of Maryland Rule 5-408. Second, he claims the court erred in relying on the post-divorce fee invoice and asserts that the entries did not show he was aware of counsel's mistake in deleting the phrase "reduced by" from subsection iii.B. Finally, he argues the

14

court erred in reforming subsection iii.B based on a finding of mutual mistake. We address each argument seriatim.

**A.**

**Maryland Rule 5-408**

As a general common law rule, parol evidence is inadmissible to vary or contradict the terms of a written instrument. *Hoffman*, 182 Md. at 210. However, "equity refuses to enforce this rule whenever it is alleged that fraud, accident or mistake occurred in the making of the instrument, and will admit parol evidence to reform the instrument." *Id.* Mr. Brvenik does not dispute that parol evidence is admissible where there is a claim of mistake. Instead, he contends that testimony and other evidence about the deletion of the phrase "reduced by" were settlement discussions, and the court admitted the evidence in violation of Maryland Rule 5-408. We disagree.

Rule 5-408 provides,

(a) The following evidence is not admissible *to prove the validity, invalidity, or amount of a civil claim in dispute:*

(1) Furnishing or offering or promising to furnish a valuable consideration for the purpose of compromising or attempting to compromise the claim or any other claim;

(2) Accepting or offering to accept such consideration for that purpose; and

(3) *Conduct or statements made in compromise negotiations or mediation.*

(b) This Rule does not require the exclusion of any evidence otherwise obtained merely because it is also presented in the course of compromise negotiations or mediation.

(c) Except as otherwise provided by law, *evidence of a type specified in section (a) of this Rule is not excluded under this Rule when offered for*

15

*another purpose,* such as proving bias or prejudice of a witness, controverting a defense of laches or limitations, establishing the existence of a "Mary Carter" agreement, or proving an effort to obstruct a criminal investigation or prosecution, but exclusion is required where the sole purpose for offering the evidence is to impeach a party by showing a prior inconsistent statement.

(d) When an act giving rise to criminal liability would also result in civil liability, evidence that would be inadmissible in a civil action is also inadmissible in a criminal action based on that act.

(emphases added).

"The purpose of Rule 5-408 is to encourage the settlement of lawsuits by ensuring that parties need not fear that their desire to settle pending litigation and their offers to do so will be construed as admissions." *Bittinger v. CSX Transp. Inc.*, 176 Md. App. 262, 276–77 (2007). "The admission of evidence is committed to the considerable and sound discretion of the trial court and will not be disturbed in the absence of abuse of that discretion." *Bos. Sci. Corp. v. Mirowski Fam. Ventures, LLC*, 227 Md. App. 177, 201 (2016) (citation modified).

Although the court treated some of the disputed evidence as not being settlement discussions, we will assume *arguendo* that they are. The court did not abuse its discretion in admitting such evidence. Ms. Kavanagh did not seek to admit the evidence to prove the validity or invalidity of a claim. Instead, she was offering the evidence "for another purpose."[5] Specifically, Ms. Kavanagh was offering it to show that the deletion of "reduced

---

[5] The Rule lists examples of "another purpose," but that list is not exhaustive. *Cf.* Fed. R. Evid. 408 (from which the Maryland Rule is derived); *see United States v. Technic Servs., Inc.*, 314 F.3d 1031, 1045 (9th Cir. 2002) (explaining that, under FRE 408, "[t]he use of the phrase 'such as' implies that the ensuing list is not exhaustive, but is only

by" in subsection iii.B was a mistake. *See Bittinger*, 176 Md. App. at 277 (explaining that Rule 5-408 was plainly not applicable "because the evidence at issue concerned previously settled claims and not promises to settle an existing claim"); *Bennett v. Ashcraft & Gerel, LLP*, 259 Md. App. 403, 449, n.19 (2023) (explaining that the Rule did not apply because the statements made during settlement negotiations were not used "to prove the validity, invalidity, or amount of" the civil claim, but instead for some other purpose).

Mr. Brvenik relies on *Berg v. Berg*, 151 N.E.3d 321 (Ind. Ct. App. 2020), *vacated*, 170 N.E.3d 224 (Ind. 2021),[6] to support his argument that such evidence was inadmissible. There, following the entry of a marital settlement agreement, the wife sought to avoid the agreement on the basis that, due to her attorney's mistaken omission of one of the husband's stock accounts, the parties relied on an incomplete marital balance sheet during mediation. *Id.* at 324. To prove that the balance sheet was incomplete, the wife offered evidence of what had transpired at mediation, namely, (1) two purported marital balance sheets

---

illustrative"), *overruled on other grounds*, *United States v. Contreras*, 593 F.3d 1135 (9th Cir. 2010) (en banc); *Lo Bosco v. Kure Eng'g Ltd.*, 891 F. Supp. 1035, 1039 (D.N.J. 1995) (stating plaintiff's notion that listing of exceptions in Rule 408 is exclusive is so "clearly false" it required no further comment).

[6] The Supreme Court of Indiana vacated the intermediate appellate court's opinion pursuant to Indiana Rule of Appellate Procedure 58(A), which provides that, subject to certain exceptions, the opinion of the intermediate appellate court is automatically vacated when the Supreme Court grants a petition to transfer, as it did in this case. *See Berg v. Berg*, 170 N.E.3d 224, 227 (Ind. 2021). Under Indiana law, reliance on a vacated opinion is "improper" because it lacks precedential value. *See Grubnich v. Renner*, 746 N.E.2d 111, 116 (Ind. Ct. App. 2001); *Meyer v. Biedron*, 667 N.E.2d 752, 753 (Ind. 1996) (noting that court of appeals's opinion was vacated by grant of transfer and thus had no precedential value). We note, however, that the Supreme Court of Indiana ultimately held, as the intermediate appellate court did, that the wife's evidence was inadmissible under Indiana Evidence Rule 408. *Berg*, 170 N.E.3d at 229–30.

17

prepared by her counsel prior to mediation; and (2) an affidavit averring that she was not aware of the mistake during mediation and, if she had been, she would not have entered the agreement. *Id.* at 324–25. The husband moved to strike, arguing that the evidence was inadmissible because it was "information that was discussed and done during mediation." *Id.* at 325. Ultimately, the trial court found that "fraud, constructive fraud, mutual mistake, or misrepresentation had occurred," denied the motion to strike, and awarded half of the value of the missing account to the wife. *Id.*

On appeal, the Court of Appeals of Indiana explained that mediation did, indeed, constitute settlement negotiations governed by Indiana Evidence Rule 408, which, like Maryland Rule 5-408, generally excludes evidence of conduct or statements made during settlement negotiations. *Id.* at 326. However, the Court of Appeals explained that the Rule 408(b) exception, which permits such evidence to be admitted "for another purpose," allows evidence to be used "in collateral matters unrelated to the dispute that is the subject of the mediation." *Id.* at 327 (citation omitted). It held that the evidence the wife sought to admit was inadmissible to show "why [she] agreed to the disposition of assets in the Settlement Agreement," which was a "non-collateral purpose." *Id.* at 329; *see also Horner v. Carter*, 981 N.E.2d 1210, 1212–13 (Ind. 2013) (explaining that statements made during mediation were inadmissible to prove what the parties meant by an ambiguous provision in the mediated agreement, which was not collateral to the mediation); *but see Gast v. Hall*, 858 N.E.2d 154, 161–62 (Ind. Ct. App. 2006) (deeming a person's unusual statements during mediation as admissible under Rule 408(b) to show the person lacked testamentary capacity, which was collateral to the mediated dispute).

18

Mr. Brvenik's reliance on *Berg* is unavailing. To the extent that the Court of Appeals of Indiana's vacated opinion has any precedential value, *see supra* n.5, the Court of Appeals noted that Indiana courts seem to exclude more evidence than other courts typically do under the analogous Federal Rule of Evidence 408, from which Maryland Rule 5-408 is derived. *See Berg*, 151 N.E.3d at 328 n.6 ("It seems that this policy preference animates Indiana Evidence Rule 408, mandating the exclusion of more evidence than our sister courts would exclude under the substantially similar federal rule."); *id.* (comparing Indiana courts' restrictive application of the rule with *Coakley & Williams Constr., Inc. v. Structural Concrete Equip., Inc.*, 973 F.2d 349, 353–54 (4th Cir. 1992), in which the Fourth Circuit "determined that a settlement offer could be admitted to resolve ambiguity, reasoning that the evidence was not offered to prove liability or damages but instead 'offer[ed] as evidence of the parties' intent' in entering the non-mediated settlement agreement").

More importantly, Mr. Brvenik overlooks another Indiana case, *Thomas v. Thomas*, 674 N.E.2d 23 (Ind. Ct. App. 1996), which reached a different result that applies to the instant case. In *Thomas*, the ex-wife moved to modify an agreed dissolution decree based on an alleged clerical error in the decree requiring her to pay her ex-husband $15,500 in one paragraph and $23,500 in another paragraph. 674 N.E.2d at 24–25. She introduced exhibits she claimed were prepared to assist her attorney in drafting the decrees and purported to demonstrate the parties' clerical error. *Id.* at 26. The court admitted the exhibits over the ex-husband's objection that their admission violated Indiana Rule 408. *Id.* The Court of Appeals of Indiana held that the evidence was admissible because it was offered for "another purpose." *Id.* It explained:

19

> Here, we find that the exhibits were not offered to show liability or invalidity of a claim, but to show the mistake in drafting the final agreed decree of dissolution. *Because the exhibits were offered for the purpose of demonstrating mistake, the exhibits are not excludable under the rule.* In addition, the exhibits were relevant to demonstrate the parties' mistake in drafting the agreed decree and to show that the final decree was contrary to the parties' intent.

*Id.* (emphasis added). Likewise, Ms. Kavanagh offered the evidence "for another purpose," i.e., demonstrating that the deletion of "reduced by" in subsection iii.B was a mistake. For the reasons stated, the court did not err in admitting evidence of any settlement discussions to show mistake.

## B.

### Post-Divorce Fee Invoice

Mr. Brvenik argues that the circuit court clearly erred in finding that his new attorney's post-divorce research into mutual mistake demonstrated his knowledge of a clerical error in subsection iii.B before signing the MSA. He contends that a billing entry made after the MSA's execution does not prove he was aware of the error beforehand. According to Mr. Brvenik, the court could not determine from the billing reference to "mutual mistake" whether he recognized the drafting error made by Ms. Kavanagh's attorney before signing, or if he discovered the error afterward and brought it to the attention of counsel, who then identified a potential issue of unilateral or mutual mistake.

Because the trial below was a non-jury trial, our standard of review is governed by Maryland Rule 8-131. That rule provides that this Court "will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses." Md. Rule 8-131(c).

20

"A finding of a trial court is not clearly erroneous if there is competent or material evidence in the record to support the court's conclusion." *Lemley v. Lemley*, 109 Md. App. 620, 628 (1996).

Moreover, "[u]nder the clearly erroneous standard, this Court does not sit as a second trial court, reviewing all the facts to determine whether an appellant has proven his case." *Id.* "Nor is it our function to weigh conflicting evidence." *Liberty Mut. Ins. Co. v. Md. Auto. Ins. Fund*, 154 Md. App. 604, 609 (2004). "Our task is limited to deciding whether the circuit court's factual findings were supported by 'substantial evidence' in the record." *Id.* In doing so, we must view all the evidence in a light most favorable to the prevailing party. *Id.*

The court did not clearly err in finding that Mr. Brvenik knew of the mistake before executing the MSA based in part on the entries in the fee invoice. The evidence established that Mr. Brvenik knew before signing the MSA that Ms. Kavanagh's attorney removed the phrase "reduced by" during the final round of proposed revisions, and that he was fully aware that without it, subsection iii.B would mean that the fair market value of the lake house equaled the mortgage balance at the time of the buyout. Although he claimed he believed Ms. Kavanagh intended this deletion as a concession in light of the many benefits she received under the MSA, the court did not find his testimony credible, particularly given his conduct following the execution of the MSA.

A mere nine days after the parties executed the MSA, Mr. Brvenik retained new counsel to address a "potential post-judgment matter." He claimed that a possible dispute over a wedding ring prompted this action. However, when questioned during cross-

21

examination about whether he actually wanted the firm to investigate the mistake in subsection iii.B, Mr. Brvenik was reticent:

> [COUNSEL FOR MS. KAVANAGH]: [Y]ou hired someone at [the law firm] at $355.00 an hour to research the standard for mistake in an agreement and the [c]ourt's authority to amend a signed MSA, correct?
>
> [MR. BRVENIK]: If that's what it states.
>
> . . .
>
> [COUNSEL FOR MS. KAVANAGH]: And then there's also amended research on mistake to include additional research on the [c]ourt's definition of mutual mistake.
>
> [MR. BRVENIK]: That's what it states.
>
> . . .
>
> [COUNSEL FOR MS. KAVANAGH]: What did you expect Ms. Kavanagh to want to revise regarding the wedding ring?
>
> . . .
>
> [MR. BRVENIK]: I didn't expect, I wanted a review to understand what exposures there might be.
>
> [COUNSEL FOR MS. KAVANAGH]: Well what would the [c]ourt's definition of mutual mistake have to do with that?
>
> . . .
>
> [MR. BRVENIK]: I'm not an attorney, I asked for a review. How they chose to review is what they do.
>
> [COUNSEL FOR MS. KAVANAGH]: Okay. And did you want to or were you considering that [Ms. Kavanagh] might want to revise the signed MSA about the wedding ring?
>
> [MR. BRVENIK]: I asked for a review.
>
> . . .
>
> [COUNSEL FOR MS. KAVANAGH]: Is it your testimony that you did not go to them to get an opinion on the language involving the fair market value of the property equaling the mortgage balance?
>
> [MR. BRVENIK]: It's my testimony that I went to them for review of the [MSA], and the impet[]us for that review was a debate over the wedding ring.

22

The court explicitly stated it did not find Mr. Brvenik credible. Weighing the evidence, including the entries in the invoice as part of the overall assessment, the court found that he knew the deletion of "reduced by" was a mistake before the parties executed the MSA. Once evidence is admitted—as the fee invoice was here without objection—the fact finder is entitled to give it "whatever weight it deems appropriate in its prerogative." *Jacobs v. State*, 45 Md. App. 634, 653 (1980). Specifically, the court was entitled to consider evidence arising after the MSA's execution to infer Mr. Brvenik's knowledge or state of mind prior to signing. *See, e.g.*, *Tufts v. Poore*, 219 Md. 1, 10 (1959) (noting that "[a] fraudulent pre-existing intent . . . . may be considered with the subsequent conduct" of the bad actor and "the other circumstances surrounding the transaction in sustaining such an inference"); *Chow v. State*, 393 Md. 431, 473 (2006) (explaining that *mens rea* may be proven by surrounding circumstances); *Graham v. State*, 117 Md. App. 280, 284 (1997) ("In determining the intent of the defendant, the trier of fact is permitted to infer the requisite intent from the surrounding circumstances."). For the reasons stated, the court did not clearly err when it found that Mr. Brvenik knew that the deletion of "reduced by" was a mistake before signing the MSA based on the entries in his post-divorce fee invoice.

## C.

### Reformation

Mr. Brvenik argues that the circuit court erred in reforming the MSA based on a finding of mutual mistake; his knowledge of counsel's mistake does not convert it into a mutual mistake. Under the circumstances here, the distinction between unilateral and mutual mistake is immaterial because reformation is justified by a unilateral mistake

23

accompanied by fraud or inequitable conduct by the unmistaken party. *See Md. Port Admin.*, 303 Md. at 58. As stated earlier, "[a] mistake by one party with knowledge of that mistake by the other *is equivalent to a mutual mistake*." Williston § 70:112 (emphasis added). "[A] mistake by one party, and knowledge of the mistake by the other, justifies relief *as fully as a mutual mistake*." *Id.* (emphasis added).

While it is true that Ms. Kavanagh's attorney inadvertently deleted the words "reduced by" and acknowledged it was her mistake, the court found that Mr. Brvenik was aware of the deletion and did not disclose it before signing the MSA. This non-disclosure constitutes, at a minimum, inequitable conduct, which the court implied in its oral ruling and equated to a "mutual mistake." Therefore, the court did not err in concluding that the circumstances justified the reformation of subsection iii.B "as fully as a mutual mistake." Williston § 70:112.

Decisions by courts in other jurisdictions are in accord. *See Tatonka Cap. Corp. v. Connelly*, 390 F. Supp. 3d 1289, 1304 (D. Colo. 2019) ("Tatonka's silence and refusal to correct Mr. Connelly's misunderstanding constitutes a misrepresentation to Mr. Connelly about the effect of the [] Agreements under Restatement Section 161 and illustration 12."); *425 Beecher, L.L.C. v. Unizan Bank, Nat'l Ass'n*, 927 N.E.2d 46, 57–58 (Ohio Ct. App. 2010) (determining that the trial court did not err in ordering reformation based on the bank's unilateral drafting mistake where the other party knew the bank's intent and said nothing); *NOLM, LLC v. Cnty. of Clark*, 100 P.3d 658, 662–63 (Nev. 2004) (explaining that where county intended to sell only remnant parcels, not entire parcels, and other party knew about the misdescription in the contract and failed to bring it to county's attention,

24

reformation of the contract to describe remnant parcels instead of entire parcels based on unilateral mistake was appropriate); *Traggis v. Shawmut Bank Conn., N.A.*, 805 A.2d 105, 112–13 (Conn. App. Ct. 2002) (concluding the trial court did not err in ordering reformation where the closing date suggested by defendant was the result of typographical error, plaintiff knew defendant's intended closing date, and plaintiff failed to inform defendant of its mistake in the hopes of extending contractual deadline); *Belk v. Martin*, 39 P.3d 592, 599 (Idaho 2001) (holding the trial court "did not err by reforming the lease that contained a unilateral mistake of which Martin had knowledge"); *Cambridge Cos., Inc. v. Williams*, 602 S.W.2d 306, 309 (Tex. Ct. App. 1980) (concluding defendant's knowledge of and failure to disclose mistake in commission note during negotiations justified reformation of the note); *Webb v. Culver*, 509 P.2d 1173, 1174–75 (Or. 1973) (en banc) (determining the trial court did not err in reforming contract in plaintiffs' favor by adding to the legal description a four-foot strip of land between the original boundary line and fence line, given that defendant's initial conduct in constructing fence and developing other parts of the property led plaintiffs to mistakenly believe the fence marked the eastern boundary of their property and defendant did not assert otherwise until five years after sale). For the reasons stated, the court did not err in reforming subsection iii.B of the MSA.

Alternatively, Mr. Brvenik argues that the court could not reform the subsection without knowing whether he would have accepted a counteroffer that retained the words "reduced by" but deleted the phrase "a) five percent (5%) of the fair market value of the Lake House," a clause he had previously requested. In other words, he claims the reformed

language does not reflect his intended agreement, and that the court reformed the contract without knowing if he would have agreed to remove the 5% reduction clause.

We are not persuaded. The claim that Mr. Brvenik may never have intended to enter into the MSA as reformed is immaterial. This is because his "non-disclosure" of a known mistake was "equivalent to an assertion that the writing [was] as [Ms. Kavanagh] underst[ood] it to be," Restatement (Second) of Contracts § 166—i.e., an agreement that the phrase "reduced by" *was* included in the provision calculating her equity in the lake house; *accord* Corbin § 28.41 ("The language of an agreement will be interpreted according to the meaning given to it by one party if the other had actual knowledge that such was the meaning so given."). As Corbin explains,

> The conduct of the other party in permitting the first to execute the erroneous writing and later attempting to enforce it may be regarded as fraudulent; but it is enough to justify reformation that he knows the terms proposed by the first party and the meaning thereof and leads that party to reasonably believe that he too assents to those terms. *This makes a contract; and the writing may be reformed to accord with it.*

Corbin § 28.45 (emphasis added); *accord Stare v. Tate*, 98 Cal. Rptr. 264, 268–69 (Cal. Ct. App. 1971) (quoting Corbin and stating that where the wife's attorney negligently undervalued the equity in real property and the husband's attorney discovered but failed to disclose the error, the husband's assertion that he never assented to the different value was "immaterial"); *Hand v. Dayton-Hudson*, 775 F.2d 757, 760–61 (6th Cir. 1985) (rejecting the argument that a meeting of the minds is required for reformation under § 166 of the Restatement (Second) of Contracts because the rule is "designed primarily to combat the inequities which naturally result from the fraudulent inducement of an innocent party to

26

sign a contract the guilty party knew did not reflect the other party's intent"); *see also Line Lexington Lumber & Millwork Co. v. Pa. Publ'g Corp.*, 301 A.2d 684, 687–88 (Pa. 1973) ("[A] party who knowingly causes a written instrument to fail to embody the intent of the other party is estopped from relying on such defect in the instrument. Moreover, *where the first party knows what the other party actually intended, the instrument will be reformed to conform to that intention.*" (emphasis added)).

Finally, Mr. Brvenik contends that the court did not explicitly "announce" that it was applying the clear and convincing evidence standard. To the extent he claims the court must state the applicable standard of proof on the record, he provides no legal authority to support this argument. "Absent an indication to the contrary, we must assume that judges apply the law correctly to the case before them." *Hebb v. State*, 31 Md. App. 493, 499 (1976). "Even when the record is silent as to the standard of proof applied by the judge, that does not suggest that the judge applied the incorrect law or made a mistake." *Bailey v. Happer*, 268 Md. App. 618, 638–39 (2026). There is no indication in the record that the court applied the wrong standard.

For the reasons stated, we affirm the judgment of the circuit court.[7]

> **JUDGMENT OF THE CIRCUIT COURT FOR HOWARD COUNTY AFFIRMED. COSTS TO BE PAID BY THE APPELLANT.**

---

[7] The judgment of absolute divorce entered on July 20, 2023, provides that the MSA dated July 12, 2023 "is hereby approved and made a part of and incorporated in this Judgment, but not merged therein, having the same force and effect as if fully set forth herein[.]" In their briefs, the parties did not raise or address how the circuit court's reformation of the MSA impacts the judgment of absolute divorce. Accordingly, we do not address this issue.